**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ABSOLUTE ACTIVIST MASTER VALUE   :
FUND, LTD., ABSOLUTE EAST WEST FUND,  :
LTD., ABSOLUTE EAST WEST MASTER    :
FUND, LTD., ABSOLUTE EUROPEAN
CATALYST FUND, LTD., ABSOLUTE      :
GERMANY FUND, LTD., ABSOLUTE INDIA  :
FUND, LTD., ABSOLUTE OCTANE FUND,   :
LTD., ABSOLUTE OCTANE MASTER FUND,  :
LTD., ABSOLUTE RETURN EUROPE FUND,  :
LTD.,

                   Plaintiffs,     :

              -against-        :

TODD M. FICETO, individually, and as guardian  :
for his children NCF and HMF, HUNTER WORLD :
MARKETS, INC., FLORIAN HOMM, COLIN  :
HEATHERINGTON, CRAIG
HEATHERINGTON, CIC GLOBAL CAPITAL  :
LTD., SEAN EWING, ULLRICH ANGERSBACH,:

                 Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM DECISION
AND ORDER

09 Civ. 8862 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiff Funds bring this action against principals and employees of the company they

engaged to manage their assets, Absolute Capital Management ("ACM") and an American

broker with whom the ACM defendants allegedly conspired to defraud the Funds. Second

Amended Complaint ("SAC"), ECF No. 107, ¶ 4. Plaintiffs allege that the Defendants violated

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder

(through theories of material misrepresentations and omissions, a scheme to defraud, market

manipulation, and churning), committed common law fraud and conspiracy to commit fraud, and

breached their fiduciary duties. Before the Court are Defendants' Motions to Dismiss (and

1

Florian Homm's Motion to Quash Service).  Defendant Ullrich Angersbach's motion to dismiss

for lack of personal jurisdiction is GRANTED.  All other Defendants' motions are DENIED.


## Background[1]

Parties

Plaintiffs are eight hedge funds registered in the Cayman Islands. SAC ¶ 11.  Each Fund

hired ACM to act as its investment manager and make trades in its accounts on its behalf

pursuant to a written investment agreement and a power of attorney. Id. ¶ 28, 30.  In return for

providing these investment services, ACM charged each Fund an annual management fee of 2%

of its net assets, and a performance fee of 20% of increase in value of each Fund.  Id.  ACM was

a publically traded company listed on the London Stock Exchange. Id. ¶ 250.  Its trading

operations were conducted from its offices in Mallorca, Spain.

The SAC alleges that Florian Homm was the motivator and mastermind behind the

fraudulent scheme to manipulate Defendants' fees and commissions and the share price of penny

stocks.  Homm is a German national who also holds a Liberian passport. Id. ¶ 12.  He was a co-

founder and significant shareholder of ACM and served as its chief investment officer,

responsible for management strategy and trading from 2004 until his resignation on September

18, 2007. Id. ¶ 12, 229.  In addition to being the chief investment officer of ACM, he was a 50%

owner of Hunter World Markets ("HWM"), the California brokerage firm with which the Funds

did significant trading.  Id.  Upon his resignation, Homm went into hiding and has been heard

from or seen only sporadically since, although he maintains an address in the UK. Id.; Imes

---

[1] The following factual allegations are taken from the Second Amended Complaint (or documents attached to it or
incorporated by reference) and are deemed to be true for the purposes of a motion to dismiss. Chambers v. Time
Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

Decl., ECF No. 144, Ex. H. at 5.  He was arrested on related criminal fraud charges in Italy on March 8, 2013, and is in custody pending extradition to the United States.

Working with Homm at ACM were brothers Colin and Craig Heatherington.  Colin Heatherington is a Canadian citizen and resides in British Columbia.  SAC ¶ 15.  Colin was Homm's "point man on trading and right hand man at ACM."  Id.  He personally placed many of the penny stock trades that are at the center of the alleged scheme before he resigned on the day before Homm did in September, 2007.  Id.  Craig is also a Canadian citizen who lives in Australia.  Id. ¶ 17.  He worked in ACM's "back office," confirming and matching the penny stock trades.  Id.  The two brothers were two of the three shareholders of Defendant CIC Global Capital, Ltd., a corporation incorporated in the British Virgin Islands.  Id. ¶ 18.

Sean Ewing was co-founder, chief executive officer, chairman, and significant shareholder of ACM from 2005 until his resignation in July, 2007.  Id. ¶ 19, 197.  He was involved in almost all aspects of the Funds' management: compliance, risk management, marketing and investor relations, calculation of the Funds' net asset values ("NAVs"), and occasionally signed money transfers that were used in the fraudulent penny stock trades.  Id. ¶ 19.  He is a citizen of Ireland and maintains a residence in Mallorca, Spain.  Id.  He appears to also have been responsible for communication with the Funds' boards of directors.  Id.

In addition to being a co-founder of ACM and briefly sitting on its board, Ullrich Angersbach was its head of investor relations and marketing from 2005 through December, 2007.  Id. ¶ 20.  In this role, Angersbach worked with placement agents and directly with potential investors, raising upwards of $2 billion for the Funds.  Id.  He lived and worked in Zug, Switzerland, not in Spain with the rest of the ACM defendants.  It is merely alleged that he made

3

five trips to the U.S. between October 2004 and November 2006, no trip lasting longer than four days.  Id. ¶ 206.

The only person named as a defendant who did not work at ACM is Todd M. Ficeto, a U.S. citizen and resident of California.  Id. ¶ 13.  Ficeto held numerous securities licenses from the Financial Industry Regulatory Authority, Inc. ("FINRA"), and was 50% owner, president and director of HWM.  Id.  He managed all aspects of HWM's business, including its trading, until he requested that its licenses be terminated in October, 2009.  Id.  In addition to allegedly participating in the scheme on his own behalf, he occasionally caused shares, options, or warrants to be issued in the names of his two minor children over whose accounts he had control.  Id. ¶ 67.

HWM, also a named defendant, is a California corporation that was registered as a broker-dealer with FINRA and the SEC.  Id. ¶ 14.  At all relevant times it was co-owned by Homm and Ficeto.  Id.  HWM served as a placement agent on the Funds' behalf for many of the penny stock transactions.  Id.  It also served as the counterparty on many of the "market" transactions through which the Funds are accused of fraudulently inflating the value of the penny stocks.[2]

The Multifaceted Scheme

The Defendants' alleged fraudulent scheme involved investment in, and manipulation of, the shares of penny stocks and had many parts. Penny stock companies are not traded in any nationally registered exchange; rather, they issue shares that are registered with the SEC, and their shares are traded on over-the-counter ("OTC") markets, including the Over the Counter Bulletin Board ("OTCBB") and the Pink Sheets.  Id. ¶ 57.  Only registered broker-dealers, such

_____

[2] Homm, Colin and Craig Heatherington and Ficeto are referred to throughout as the Trading Defendants.

as HWM, can quote and trade such securities. Id. All of the companies involved were traded on either the OTCBB or the Pink Sheets, and incorporated in the United States.[3] Id. ¶ 62.

In general, the first step was an initial investment directly into one of the fledgling penny stock companies, called a private investment in public equity ("PIPE"). Id. ¶ 42. Pursuant to an offering memorandum, ACM would cause one or more of the Funds to wire money to the bank or escrow agent of one of the penny stock companies in the U.S. Id. ¶ 48. In exchange, the company would then issue shares to the Fund or Funds that had made the investment. Id. The offering memorandum provided the details of the subscription, including the procedures for wiring money, the physical location where the subscription would close, the location where the Funds would incur irrevocable liability, and how the newly issued shares would settle. Id. ¶¶ 47-52.

In the course of these PIPE transactions, certain defendants would often reap private benefits at the Funds' expense in two ways. First, the Trading Defendants would cause the Funds to pay outsized "placement fees" to HWM, who usually acted as the broker or placement agent of the Funds for these transactions. Id. ¶ 40. For example, in the PIPE transaction in which ACM caused the Funds to invest $9.25 million in ProElite, ACM caused the Funds to pay HWM a placement fee of $1 million, over 10%. Id. ¶ 78.

Second, as a condition of the Funds' investment, the Trading Defendants often personally received shares, options, or warrants from the penny stock company. Id. ¶ 40. They had these shares, options, or warrants issued to them (or entities controlled by them such as HWM or CIC) at prices far below what the Funds paid for their shares. Id. The issuance of these shares,

---

[3] The SAC alleges that the scheme involved the trading of eight penny stock companies: Berman Center, Inc. (ticker BRMC), DuraVest, Inc. (DUVT), InterMetro Communications, Inc. (IMTO), Java Detour, Inc. (JVDT), Logistical Support, Inc. (LGSL), MicroMed Cardiovascular, Inc. (MMCV), NuRx Pharmaceuticals, Inc. (NUXP, formerly known as Quest Group International, Inc., QSTG), and ProElite, Inc. (PETE or PELE). SAC ¶ 62.

options, or warrants was for no other apparent purpose, save the personal enrichment of the Trading Defendants. Id. For example, in exchange for the Funds investing $5.15 million (for 6.8 million shares) into MicroMed, HWM not only paid itself a placement fee of $575,000, but caused MicroMed to issue HWM 3.4 million warrants. Id. ¶ 92(b).

After the Trading Defendants caused the Funds to buy shares in the penny stock companies through these PIPE transactions, the next step was for the Funds to trade these shares amongst themselves, thereby artificially inflating the shares' value. Id. ¶ 53. The "vast majority" of these trades were done through HWM in California. Id. ¶ 66. Each trade benefitted the Defendants in several ways. First, the trades allegedly generated fraudulent and often "outrageously high" commissions for HWM. Id. ¶ 54, 107. Second, because the markets for these shares were very thin, the Trading Defendants were able to use these inter-fund trades to manipulatively increase the price of the penny stock shares. Id. ¶ 54. Artificially inflating the value of the Funds' assets in turn artificially inflated the Funds' NAVs, which caused them to pay higher management and performance fees to ACM. Id. Third, as some of the shares, options, or warrants issued to the Trading Defendants were restricted until the penny stock shares reached a certain price, inflating the value also allowed the restrictions on those shares to lapse. Id.

ACM also caused the Funds to purchase shares of the penny stock companies (those shares and warrants that the trading defendants had personally received after the PIPE transactions) from the Trading Defendants themselves. Id. ¶ 53. The Trading Defendants would often disguise these as "market" transactions, not disclosing that, in fact, they were causing the Funds to purchase shares from HWM (an entity co-owned by Homm and Ficeto) or CIC (an entity co-owned by Colin and Craig Heatherington). See, e.g. Id. ¶ 81. The Trading Defendants

6

caused the Funds to purchase these shares—shares that HWM or CIC had obtained for virtually nothing—at vastly inflated prices, thereby using the Funds' money to enrich themselves. Id.

In addition to allegedly defrauding the Funds at every step of this penny stock scheme, the Trading Defendants caused the Funds to invest money into a vehicle called The Hunter Fund. Id. ¶ 34. The Hunter Fund was a shell corporation registered in the British Virgin Islands by Homm and Ficeto, and allegedly existed for no other reason than to conceal the fraudulent trading and generate additional management and performance fees for themselves. Id. ¶ 164. The Trading Defendants would cause the Funds to place money into The Hunter Fund, which charged the Funds a 2% annual management fee and a 5% performance fee. Id. The Hunter Fund would then participate in the same penny stock transactions as the Funds themselves, making PIPE subscriptions into penny stock companies and trading those shares with the Funds to inflate their value. Id. Using The Hunter Fund also allowed the defendants to conceal their scheme, as trades with it appeared to be with an unrelated entity. Id.

The SAC alleges that the defendants went to great lengths to conceal the scope of this scheme from the Funds. For example, in 2006, a former employee of ACM, identified by the pseudonym "Joseph Arness" sent an email that described the scheme to "various financial institutions and individuals." Id. ¶ 169.[4] After learning of this email, Ewing and Homm conspired to identify its sender and then intimidated that person into retracting it. Id. ¶¶ 173-177. After arranging its retraction, Ewing covered up the email, only revealing to two Fund directors that it had received an "anonymous letter" alleging "misconduct in the management of the Company's funds." Id. ¶ 179. Ewing proffered that he had investigated the email and found it to be baseless, when, in fact, he had undertaken no such investigation and orchestrated its retraction. Id.

---

[4] Nearly the entire email is reproduced in the complaint. SAC ¶¶ 170-171.

By July of 2007, the penny stocks made up 45% of the Funds' holdings. Id. ¶ 233. Shares of ACM began to drop as word got out that much of its portfolio was tied up in these illiquid investments. Id. Ewing resigned as CEO in July, 2007, and as chairman a month later. Id. To offset market losses from the scheme, Homm donated 5 million of his own shares in ACM to the Funds on August 31, 2007. Id. ¶ 234. On the eve of ACM disclosing this gift, Homm and Colin Heatherington announced their resignations and Homm went into hiding. Id. ¶ 237. Faced with a raft of negative publicity and redemption requests from investors, the Funds were forced to freeze redemptions and restructure in order to maximize what little value was left in their holdings. Id. ¶ 238. Plaintiffs allege they suffered upward of $200 million in damages. Id. ¶ 4.


Procedural History

The Funds filed their first complaint in this action on October 19, 2009, and filed their first amended complaint ("FAC") one month later. See ECF Nos. 1, 3. All Defendants responded and moved to dismiss, except for Homm and CIC (both of which were served but did not appear). While the Defendants' motions to dismiss were pending, the Supreme Court issued its pivotal decision in Morrison v. National Australia Bank, 510 U.S. ___, 130 S. Ct. 2869 (2010). Morrison limited the extraterritorial application of the securities laws, abrogating this Circuit's "conduct and effects" test in favor of a "transactional" test. Id. at 2884. Finding that the First Amended Complaint ("FAC") did not meet the new "transactional" test, this Court dismissed the FAC under Morrison in December, 2010. See Absolute Activist Master Value Fund, Ltd. v. Homm, No. 09 Civ. 8862, 2010 U.S. Dist. LEXIS 137150 (S.D.N.Y. Dec. 22, 2010) ("Absolute Activist I"). Plaintiffs appealed.

The Second Circuit agreed that the Plaintiff's FAC did not, in its then-existing form, state a claim upon which relief could be granted post-<u>Morrison</u>.  <u>Absolute Activist Master Value Fund, Ltd. v. Ficeto</u>, 672 F.3d 143 (2d Cir. 2012) (<u>as amended</u>, 677 F.3d 60).  The Circuit took the opportunity to elaborate on the new <u>Morrison</u> test, granted Plaintiffs leave to amend their complaint to show compliance with <u>Morrison</u>, and remanded the action to this court.  Plaintiffs filed their SAC on July 6, 2012, and Defendants filed the instant motions to dismiss shortly thereafter.[5]  Defendants argue that the SAC fails to state a claim upon which relief can be granted, that this Court lacks personal jurisdiction over several of the Defendants, that the SAC is time barred, and that the Complaint is still precluded by <u>Morrison</u>.

## The SAC States a Claim for Violations of the Exchange Act

<u>Legal Standard</u>

Ewing, Ficeto, HWM, and Colin and Craig Heatherington move to dismiss for failure to state an actionable violation of the securities laws.[6]  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal

---

[5] Every defendant except Craig Heatherington, Homm and CIC filed their motions to dismiss on August 10, 2012. See ECF Nos. 110, 114, and 119. Craig Heatherington, now proceeding <u>pro se</u>, joined in the motions of the other defendants on September 20, 2012.  See ECF No. 125.  Homm filed his Motion to Quash Service and his Motion to Dismiss several months later, on November 14, 2012.  <u>See</u> ECF No. 135.  CIC failed to respond to the FAC or SAC and has not made any appearance to date.

[6] Angersbach, too, moved for dismissal for failure to state a claim.  As this Court finds that it lacks personal jurisdiction over Angersbach, it does not reach whether the SAC states a claim for securities violations against him. Homm filed a "Notice of Joinder" on December 6, 2012, in which he seeks to join in and adopt the motions of his co-defendants.  <u>See</u> ECF No. 141.  Not only is Homm's "Notice" untimely, but Homm had already made a motion to dismiss pursuant to Rule 12 on November 14, 2012.  <u>See</u> ECF No. 135.  A party that makes a Rule 12 motion "must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2).  All of the defenses in which Homm seeks to join were unequivocally available to him at the time of his prior motion.  "Any defense that is available at the time of the original motion, but is not included, may not be the basis of a second pre-answer motion."  Wright & Miller 5C Fed. Prac. & Proc. Civ. § 1384 (3d ed.).  Even if Homm is permitted to raise the same motion to dismiss for failure to state a claim as his co-defendants, such a motion would fail on its merits.

quotation marks omitted).  "A claim has facial plausibility where the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Id.  "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement

to relief.'"  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

     "A complaint alleging securities fraud must also satisfy the heightened pleading

requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities

Litigation Reform Act of 1995," ("PSLRA").  Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d

98, 108 (2d Cir. 2012); 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that allegations of fraud be

stated "with particularity."  Fed. R. Civ. P. 9(b).  To satisfy this requirement the plaintiff must

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks

omitted).  The PSLRA requires those securities fraud complaints alleging misstatements or

omissions to specify each misleading statement and detail facts as to why the statement is

misleading.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (citing 15 U.S.C. § 78u-

4(b)(1)).  Complaints alleging that the defendants engaged in other types of securities fraud—

here, market manipulation, a scheme to defraud, and churning—need not meet this requirement,

but as with all securities fraud complaints, must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  Id., § 78u-4(b)(2).

     The required state of mind for securities fraud claims is scienter, which is a mental state

"embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 192 n.12 (1976).  A complaint may adequately plead scienter either (1) "by alleging facts to

show that defendants had motive and opportunity to commit fraud, or (2) by alleging fats that

constitute strong circumstantial evidence of conscious misbehaviour or recklessness." Lerner v.

Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006).  Motive entails "concrete benefits that

could be realized by one or more of the false statements and wrongful nondisclosures alleged."

Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000).  Opportunity consists of "the means and

likely prospect of achieving concrete benefits by the means alleged." Id.  Conscious misbehavior

"is easily identified since it encompasses deliberate illegal behavior." Id. at 308.


Scienter

　　　　Scienter is an element common to all of Plaintiffs' Exchange Act claims.  Plaintiffs

provide extensive facts that lend to the strong inference of scienter required for each defendant in

their SAC.  The facts in the complaint not only allege motive and opportunity, but also

intentional misconduct and deliberate illegal behaviour.  Novak, 216 F.3d at 308.  The SAC

alleges that Ficeto and HWM earned large placement fees and commissions from the PIPE

transactions and subsequent manipulative trades.  See, e.g., SAC ¶¶ 78, 84, 88.  It alleges that

Homm, Ficeto (through HWM), and Colin and Craig Heatherington deliberately manipulated the

OTC market for penny stocks in the U.S by trading penny stocks between the Funds and

inflating their prices.   It alleges that these defendants engaged in deliberate self-dealing, selling

securities that they owned to the Funds at artificially high prices to enrich themselves.  See, e.g.,

id. ¶¶ 53, 78, 92.  The SAC goes into great detail on these allegations, recounting specific trades

on specific dates for specific amounts and with specific companies or counterparties.  See id. ¶¶

74-163.  These particular and express allegations of deliberate misconduct "easily satisfy the

11

standard for pleading scienter." In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 472

(S.D.N.Y. 2004).

The SAC adequately alleges the requisite strong inference of scienter for Ewing as well.

It alleges that he sold 55% of his ACM shares and redeemed all of his investments in the Funds

before he resigned as CEO and news of ACM's troubled Funds became public.  SAC ¶ 229.

Such large trades, timed entirely before full news of ACM's problems were revealed to the

market, are strongly indicative of scienter.  See Stevelman v. Alias Research Inc., 174 F.3d 79,

82 (2d Cir. 1999) (sale by several insiders of 40% of their shares were indicative of scienter).

The SAC alleges that Ewing lied to conceal his knowledge after the scheme ended, telling

Bloomberg News that he had never heard of HWM in a December, 2007 article.  SAC ¶ 189.

Plaintiffs claim that the Arness email detailed HWM's involvement.  They also contend that

Ewing had communicated with Ficeto previously, both by telephone and email to his address at

HWM.  Id.

Further, the SAC alleges in great detail the lengths to which Ewing went to cover up the

Arness email in 2006.  SAC ¶¶ 169-179.  It alleges specific facts as to how Ewing and Homm

intimidated Arness into retracting the email and then claimed to Fund directors that he had

conducted a bona fide internal investigation, when in fact he had not.  Id.  Such allegations of

deliberate misbehavior are sufficient to create the strong inference of scienter required to survive

a Rule 12(b)(6) motion to dismiss.


Scheme to Defraud (Count I)

The broad language of Section 10(b) "extends to manipulation of all kinds, whether by

making false statements or otherwise."  United States v. Royer, 549 F.3d 886, 900 (2d Cir.

2008).  Rule 10b-5 makes it unlawful "for any person, directly or indirectly . . . (a) to employ any

device, scheme, or artifice to defraud . . . or (c) to engage in any act, practice, or course of

business which operates or would operate as a fraud or deceit upon any person, in connection

with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a), (c).  To state a scheme

claim under Rule 10b-5(a) or (c), a plaintiff must allege that the defendant "(1) committed a

deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities

or was otherwise in connection with their purchase or sale, and that (4) defendants' actions

caused the plaintiffs' injuries."  In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y.

2005) (emphasis omitted).

The SAC alleges a paradigmatic scheme to defraud, adequately pleading each element

with respect to all Defendants.  For the Trading Defendants, it alleges in great detail the

numerous deceptive and manipulative acts involved in the penny stock transactions, including

rigging their market prices, and selling personal shares to the Funds to reap personal profits.  It

identifies specific acts by each defendant, and describes how they worked in concert to defraud

the Funds: Homm and Colin Heatherington as directing the trades from Spain, Ficeto as broker

when the trades passed through the U.S., and Craig Heatherington fraudulently matching the

trades on the back end.  Additionally, each defendant sold penny stock shares from accounts he

controlled (in the case of Homm and Ficeto, HWM, and in the case of the Heatheringtons, CIC)

to the Funds at inflated prices.  This behavior affected the market for securities (as it artificially

inflated the value of the penny stocks), and caused losses to the Funds (who paid inflated

management and performance fees to ACM, among other injuries).

The SAC adequately alleges a fraudulent scheme with respect to Ewing as well.  It

alleges that he affirmatively misled Fund directors when he covered up the Arness email, and

had some role, albeit limited, in the fraudulent trades by virtue of signing four wire transfers that

were used to purchase penny stocks. Such acts "were directly linked to the deception" wrought

upon the Funds, which is sufficient for scheme liability. VanCook v. SEC, 653 F.3d 130, 139

(2d Cir. 2011).

Misrepresentations and/or Omissions (Count I) [7]

     Rule 10b-5 also prohibits stating "any untrue statement of a material fact" or omitting "to

state a material fact necessary in order to make the statements made . . . misleading." 17 C.F.R.

§ 240.10b-5(b). To state a claim for material misstatements and/or omissions, a complaint must

allege that the defendant (1) made misstatement or omissions of material fact, (2) with scienter,

(3) in connection with the purchase or sale of securities, (4) reliance by the plaintiff, and (5) loss

causation. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (citing In re IBM

Secs. Litig., 163 F.3d 102, 106 (2d Cir. 1998)). Where a defendant engages in market

manipulation or a scheme to defraud in violation of Rule 10b-5(a) or (c), that misconduct creates

a duty to disclose. In re Initial Public Offering Secs. Litig., 241 F. Supp. 2d 281, 381-82

(S.D.N.Y. 2003). Silence that conceals illegal activity is "intrinsically misleading," and violates

Rule 10b-5.[8] Id.

     As the SAC has already adequately pleaded the elements of a scheme to defraud, it is

only a short step to conclude that it has adequately pleaded a claim for misrepresentations and/or

---

[7] As Plaintiffs have adequately alleged a securities fraud claim under Rule 10b-5, they have also made out a claim for common law fraud for the same alleged misrepresentations and/or omissions. See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005) (noting that the "elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement that the fraud be 'in connection with the purchase or sale of securities.'" (quoting Manela v. Garantia Banking, 5 F. Supp. 2d 165, 178-79 (S.D.N.Y. 1998)); accord Trinity Bui v. Indus. Enters. of Am., 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009).

[8] The Second Circuit recently acknowledged that "[t]here is some disagreement over whether the act of market manipulation itself triggers a duty to disclose," but did not affirmatively resolve the issue. Levitt v. J.P. Morgan Secs., Inc., No. 10-4596-cv, 2013 U.S. App. LEXIS 5329 at *36, n.9 (2d Cir. Mar. 15, 2013) (citing In re IPO, 241 F. Supp. 2d at 381, and Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 941 (9th Cir. 2009)).

omissions. By not revealing its scheme to defraud to the Funds and the market, the Trading Defendants deprived the Funds of the presumption that its managers were acting legally. The Funds relied on such silence to their detriment, losing millions of dollars because they were unaware and unable to take action to put an end to the fraud. But for failing to disclose the fraud, the Funds (under ACM's direction) would not have entered into many, if not all, of the penny stock transactions. Further, Ewing affirmatively misled Fund directors when he covered up the Arness email. ACM and its employees had fiduciary obligations to the Funds to manage their money prudently, which they allegedly violated by engaging in this penny stock scheme.

Ficeto and HWM's collusion with the ACM employees effectively made them ACM's agent, and possibly led to a duty to disclose as well. The SAC alleges that HWM was not acting as a bona fide broker (tasked with selling securities on the "open market"), but conspired with Homm and ACM to fix prices and trade between funds to generate commissions. It would be inappropriate to dismiss the misrepresentations and/or omissions claim against Ficeto and HWM before the parties are allowed to develop the factual record concerning the extent of their alleged collusion. See De Kwiatkowski v. Bear, Stearns & Co., 306 F.3d 1293, 1306 (2d Cir. 2002) (true nature of the relationship between broker and client is an issue of fact that can lead to differing liability depending on the situation). If Ficeto and HWM abdicated their roles as ministerial middlemen, engaged in honest securities trading, in favor of joining Homm's scheme, then they became subject to a duty to disclose. C.f. Levitt v. J.P. Morgan Secs., Inc., No. 10-4596-cv, 2013 U.S. App. LEXIS 5329 at *31-37 (2d Cir. Mar. 15, 2013) (noting, in an analogous factual scenario, that when a clearing broker sheds its role and became part of a manipulative scheme, it took on a duty to disclose).[9]

---

[9] In addition, Ficeto and HWM sold shares of penny stocks to the Funds (along with the ACM Trading Defendants) at prices that they helped inflate as part of the scheme, which also may have given rise to a duty to disclose these

Market Manipulation (Count II)

Market manipulation refers to practices such as "matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977). It "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011) (quoting Ernst & Ernst, 425 U.S. at 199) (internal quotations omitted). "In identifying activity that is outside the natural interplay of supply and demand, courts generally ask whether a transaction sends a false pricing signal to the market." ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 100 (2d Cir. 2007). To plead market manipulation under Rule 10b-5(a) and (c), a plaintiff must allege: "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Wilson, 671 F.3d at 129 (quoting ATSI, 493 F.3d at 101) (internal quotations omitted).

The SAC alleges that the Trading Defendants engaged in market manipulation, and they do not seriously challenge the adequacy of this allegation (save for the adequacy with which the SAC pleads scienter, which was dealt with supra). Nor could they, as the SAC sets out numerous instances where the Trading Defendants artificially inflated the value of penny stocks involved in the scheme. The SAC details multiple instances where the Trading Defendants caused the Funds to trade penny stocks amongst themselves at inflated prices. For example, on

---

insider transactions. See SEC v. Obus, 693 F.3d 276, 284-85 (2d Cir. 2012) (discussing the various theories of § 10(b) liability for insider traders, including the "abstain or disclose" rule, under which one who has a fiduciary duty and access to non-public information has a duty to abstain from trading or disclose the information publically). Here, Ficeto and HWM, as willing instrumentalities of Homm's conspiracy to defraud, may have taken on the same duties to the Funds that Homm had.

July 3, 2006, the Trading Defendants caused Absolute Octane Fund, Ltd., to sell 500 shares of MicroMed to Absolute European Catalyst Fund, Ltd. for $4.20 per share, despite the fact that about a month earlier, those same shares had been trading at $1.55 each. SAC ¶ 94. This is highly unusual where, as here, the markets for these securities are thin and illiquid. By trading the penny stocks between HWM and the Funds, the Trading Defendants were able to set the price of these securities virtually at will, thereby manipulating their market.

Churning (Count III)

Churning refers to "overtrading . . .for the purpose of increasing the amount of commissions." Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983); see also Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002) ("Churning occurs when an account has been excessively traded to generate commissions in contravention to the investor's expressed investment goals.") (quoting Saxe v. E.F. Hutton & Co., Inc., 789 F.2d 105, 112 (2d Cir. 1986)). There are three elements to a churning violation: (1) the broker or manager exercised control over the account, (2) the trading was excessive in light of the customer or investor's investment objectives, and  (3) the broker or manager acted with the intent to defraud or with reckless disregard for the customer's interest—i.e. scienter. Smith v. Petrou, 705 F. Supp. 183, 187 (S.D.N.Y. 1989).

The SAC alleges multiple instances in which the Funds generated outsized commissions for HWM (and its co-owners, Ficeto and Homm) when the Trading Defendants caused the Funds to trade penny stocks amongst themselves. For example, on April 27, 2007, the SAC alleges that the Trading Defendants caused Absolute European Catalyst Fund Limited to sell 3,000,000 shares of ProElite to Absolute Return Europe Fund Limited through HWM. SAC ¶ 80. HWM,

17

as broker on both sides of the trade (i.e. purchaser of the shares from Absolute European Catalyst and seller to Absolute Return Europe) paid itself $300,000 in commissions. Id. The SAC alleges that not only was this commission outrageously high relative to standard commissions, but that this trade occurred for no other reason than to generate the commission for HWM.

The SAC alleges that Ficeto and HWM conspired with Homm in every trade that the Funds made through HWM. Trading between the Funds is not an indication of any genuine investment strategy. Brokers involved in collusive schemes with fund managers can be liable for churning themselves. See Petrou, 705 F. Supp. at 187.

* * *

In sum, the SAC adequately states a claim for each Exchange Act violation pled against each defendant over which this Court has personal jurisdiction.

### There Is Personal Jurisdiction over Each Defendant except Angersbach

Legal Standard

The Plaintiffs bear the burden of demonstrating personal jurisdiction over the Defendants. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003). To survive a motion to dismiss for lack of personal jurisdiction, "a plaintiff must make a prima facie showing that jurisdiction exists." Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006). This showing entails averring facts that, if proven, suffice to establish jurisdiction over the defendants. Penguin Group (USA) Inc. v. Am. Buddha, 609 F.3d 30, 35 (2d Cir. 2009).

The Exchange Act permits nationwide personal jurisdiction "to the limit of the Due Process clause of the Fifth Amendment."[10] SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir.

---

[10] A district court can assert personal jurisdiction over parties on related state law claims, such as those the Plaintiffs have brought here, where a federal statute authorizes nationwide jurisdiction, and the federal and state claims derive

18

1990); Dynegy Midstream Servs. v. Trammochem, 451 F.3d 89, 95-96 (2d Cir. 2006); 15 U.S.C.

§ 78aa.  To satisfy the statute, Plaintiffs need only plead that (1) the defendants had sufficient

minimum contacts with the United States, and that (2) the assertion of jurisdiction is reasonable.

Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567-68 (2d Cir. 1996).  In

determining whether a given defendant had minimum contacts with the forum, courts

differentiate "between general or all-purpose jurisdiction, and specific or case-linked

jurisdiction."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)

(citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, nn. 8, 9 (1984)).

Courts look for "circumstances, or a course of conduct, from which it is proper to infer an

intention to benefit from and thus an intention to submit to the laws of the forum . . . ." J.

McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2787 (2011).

"General jurisdiction is authorized where the defendant's affiliations with the [forum] are

so continuous and systematic as to render it essentially at home in the forum . . . ." Licci v.

Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 n.9 (2d Cir. 2012) (citing Goodyear, 131 S. Ct.

at 2851) (internal quotations omitted).  For individuals, "the paradigm forum for the exercise of

general jurisdiction is the individual's domicile." Goodyear, 131 S. Ct. at 2853.  A court asserts

general jurisdiction over a defendant when it is allowed to hear any claim against the defendant,

regardless of whether the claim arose out of actions directed at the forum. Licci, 673 F.3d at 60,

n.9.

By contrast, jurisdiction is specific when the suit "aris[es] out of or relate[s] to the

defendant's contacts with the forum." Helicopteros, 466 U.S. at 414, n.8.  Specific jurisdiction is

proper when the in-forum activity "gave rise to the episode-in-suit" or a defendant's "single or

---

from a common nucleus of operative fact.  IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir.
1993).

occasional acts" in the forum are sufficient to render that defendant answerable with respect to those acts.  Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945).  The plaintiff must show that the defendant "purposefully availed" himself of the laws of the forum to the extent that it was foreseeable that he could be "haled into court" there.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

The reasonableness inquiry "asks whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice."  Metropolitan Life Ins., 84 F.3d at 568 (citing Int'l Shoe, 326 U.S. at 316).  This inquiry involves balancing the following five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  Metro. Life Ins., 84 F.3d at 568 (citing Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 113-114 (1987)).


The Marketing Trips to the U.S. Are Insufficient to Confer Personal Jurisdiction over Angersbach and Ewing

Both Angersbach and Ewing moved to dismiss for lack of personal jurisdiction.  They argue that their connections to the U.S. are too attenuated to support general jurisdiction, and that the injuries to the Plaintiff Funds did not arise out of their contacts to the U.S.  The Funds argue that jurisdiction over Angersbach and Ewing is proper and reasonable because their fundraising trips to the U.S. and interactions with U.S. investors "fueled the fraud."  SAC ¶ 186.  The SAC alleges that Angersbach made a total of five such trips to the U.S. from October 2004 to

November 2006, with no trip lasting longer than four days. Id. ¶ 206.  The SAC alleges that
Ewing made only three short trips between July 2005 and January 2007.

The marketing trips and interactions with U.S. investors are insufficient to confer specific
jurisdiction over Angersbach and Ewing because the harms upon which Plaintiffs base their suit
do not arise out of the act of soliciting U.S. investors.  The Plaintiffs in this action are the Funds
themselves, not aggrieved American investors.  The fundraising trips to the U.S. may have
injured U.S. investors, but this Court cannot see how they injured the Plaintiff Funds.  It was the
manipulative trading by Homm, the Heatheringtons, Ficeto, and HWM that was the proximate
cause of the Funds injury.  These trips did not "[give] rise to the episode-in suit" because neither
Angersbach nor Ewing made any fraudulent statement to the Funds on these trips—they spoke to
U.S. investors.  Int'l Shoe, 326 U.S. at 414, n.8.  These trips are, at best, attenuated, "but for"
causes of the injury to the Funds, and are insufficient to confer personal jurisdiction under
Second Circuit precedent, given the limited nature of each defendant's contacts.  See Burger
King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) ("attenuated" contacts are insufficient to
confer personal jurisdiction).

The Second Circuit takes a "flexible" approach to the level of causation required for a
defendant's minimum contacts to be constitutionally sufficient.[11]  Ponte v. Universal City Dev.
Partners, Ltd., No. 07 Civ. 2360, 2008 U.S. Dist. LEXIS 3528 at *32 (S.D.N.Y. Jan. 16 2008).
The "relatedness test is but a part of a general inquiry which is designed to determine whether
the exercise of personal jurisdiction in a particular case does or does not offend traditional
notions of fair play and substantial justice," involving "a consideration of the relationship among

---

[11] The Sixth, Seventh, and Ninth Circuits hold that minimum contacts exist when a defendant's conduct inside the
forum is a "but for" cause of the plaintiff's injury.  See Chew v. Dietrich, 143 F.3d 24, 29 (2d Cir. 1998).  By
contrast, the First and Eighth Circuits have held that jurisdiction over a defendant is proper only when the
defendant's conduct within the forum is the "proximate cause" of the plaintiff's injury.  Id.

the defendant, the forum, and the litigation." <u>Chew v. Dietrich</u>, 143 F.3d 24, 29 (2d Cir. 1998) (internal citations omitted).  Importantly, the Circuit has held that "[w]here the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts." <u>Id.</u> Solicitation of U.S. investors was not what proximately caused the Plaintiff Funds to lose money.[12]

Because marketing the Funds to U.S. investors on five trips from Switzerland constitutes Angersbach's only contacts with the U.S., Angersbach's Motion to Dismiss is GRANTED for want of personal jurisdiction.  The SAC, however, raises additional contacts that Ewing had with the U.S. that more directly relate to the injury to the Funds, and are thus sufficient to confer jurisdiction over him.

<u>There Is Personal Jurisdiction Over Ewing by Virtue of His Other Acts Directed at the U.S.</u>

In addition to marketing trips, the SAC alleges two other acts that Ewing took directed at the U.S. that caused injury to the funds.  First, the SAC alleges that Ewing "collaborate[d]" with Homm to identify the author of the Arness email, intimidated him, and then covered up the entire episode.  SAC ¶¶ 169-180.  Second, the SAC alleges that Ewing's signature is on four wire transfers of monies that were used to purchase penny stocks in furtherance of the scheme.  SAC ¶ 182 ("Ewing personally approved payments for certain of the Penny Stock transactions, including transactions between [HWM] and the Funds.").

---

[12] By raising money, they may have aided and abetted the Trading Defendant's fraud, but they cannot be held liable under such a theory.  <u>SEC v. Apuzzo</u>, 689 F.3d 204, 211 (2d Cir. 2012) ("Section 20(e) of the Securities Exchange Act of 1934 allows the SEC, but not private litigants, to bring civil actions against aiders and abettors of securities fraud.") (<u>citing</u> 15 U.S.C. § 78t(e)).

Intimidating the author of the Arness email into retracting it, thus facilitating Ewing's subsequent cover-up, is sufficient to confer jurisdiction over Ewing.  Ewing's intimidating acts were directed at the author in the U.S.  The SAC specifically alleges that Ewing used a private investigator to track the IP address of the sender of the Arness email to "the region in the United States where the Former Employee lived."  SAC ¶ 174.  After finding Arness, the SAC alleges that Ewing contacted him by telephone and threatened to harm him physically.  Id. ¶ 175.  Ewing dictated the retraction that Arness would eventually write in a series of telephone calls over several days (presumably to Arness's location in the U.S.).  Id. ¶ 176.  Ewing then told Fund directors that the author of the email had retracted it and that it "had no substance."  Id. ¶ 179. Ewing's coercive activity directed at Arness in the U.S. caused injury to the Funds as it allowed the fraudulent scheme to continue undetected for over another year.

Second, just as Homm's trading activity with HWM in the U.S. constituted sufficient minimum contacts, so was Ewing's personal approval of payments for some of the penny stock purchases in the U.S.  The SAC contains specific factual allegations of four wire transfers that Ewing authorized that sent money to the U.S. in order to pay for purchases of penny stocks. SAC ¶ 182.  For example, Ewing authorized the payment of $1.4 million from the Funds to the law firm trust account of the Los Angeles-based law firm of Troy & Gould.  Id.  These were acts directed at the U.S. out of which the Funds cause of action arose, as these penny stock purchases were part-and-parcel of the fraudulent scheme.[13]

---

[13] Based on these actions, jurisdiction over Ewing could also be proper based on a theory of conspiracy.  See Allstate Life Ins. Co. v. Linter Group, Ltd., 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (collecting cases applying a theory of conspiracy to the question of personal jurisdiction under the Exchange Act); see also In re Satyam Computer Servs. Secs. Litig., Fed. Sec. L. Rep. (CCH) P97247 (S.D.N.Y. 2013).  This theory imputes the actions of one co-conspirator that are directed at the forum to other co-conspirators if the plaintiff adequately alleges the following elements: 1) a prima facie showing of a conspiracy, 2) specific facts that warrant the inference that the defendant was a member of the conspiracy, and 3) that the defendant's co-conspirator committed acts in furtherance of the conspiracy in the forum.  Allstate, 782 F. Supp. at 221.  Here, Plaintiffs allege that Ewing had knowledge of

Jurisdiction over Ewing is also reasonable. Although Ewing is a foreign national, he purposefully directed activity at the U.S. that furthered the fraudulent scheme, manipulating domestic OTC markets and violating U.S. securities laws. The U.S. has a great interest in seeing that its securities laws are followed. Witnesses, such as Ficeto, and documents, such as those that might be at HWM, are present in the forum. Given the realities of modern transportation and communication, Ewing has not made the required "compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477.

There is Personal Jurisdiction over the Trading Defendants

Of the Trading Defendants, only Homm moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).[14] Homm argues that there is no personal jurisdiction over him in the U.S. because his overseas trading actions did not have any effects in the U.S., nor was it purposefully directed at the U.S. Homm Br. at 14-15. This argument is directly contradicted by the well-pled allegations in the SAC. The SAC adequately alleges that Homm was the mastermind behind the penny stock trading, which was done predominantly through HWM in the United States. SAC ¶ 25, 38. He caused Fund monies to be directly invested in the PIPE transactions, which closed in the United States. Id. ¶¶ 42-52. He participated in the subsequent

---

Homm's scheme, took active steps to further it by wiring money and covering it up (which are suggestive of an agreement to violate the securities laws), and knew that Homm was regularly transacting in the U.S.

Jurisdiction over Angersbach would not be proper under this theory because the SAC only provides conclusory allegations that Angersbach knew about the conspiracy. See SAC ¶ 203 (merely alleging that Angersbach exchanged emails with Ewing and Colin Heatherington regarding the Funds' NAVs, but not alleging any facts that could lead to the conclusion that Angersbach had any idea that the NAVs were being manipulated). The allegations in the complaint are insufficient to show any agreement by Angersbach that would have made him a member of the conspiracy.

[14] There is plainly personal jurisdiction over Ficeto, a U.S. citizen who lives in California and who is alleged to have participated in the fraudulent scheme from California, and HWM, the California corporation through which Ficeto acted. There is personal jurisdiction over Colin and Craig Heatherington for largely the same reasons that it exists for Homm, although neither defendant moved to dismiss on this ground.

trading of the penny stocks, thereby manipulating the value of those stocks on the U.S. OTC market. Id. ¶¶ 53-73. He directed this trading through HWM in the U.S. Id. ¶¶ 64-73. He had the U.S. penny stock companies issue warrants to him. See, e.g., Id. ¶ 79. And he earned fraudulent placement fees for directing the Funds' investments through HWM, in the U.S. See, e.g., Id. ¶ 78. Much of Homm's scheme involved trading and doing business in the U.S.[15]

These actions are sufficient minimum contacts with the forum such that the exercise of specific jurisdiction over Homm is proper and reasonable. Homm purposefully reached beyond his own domicile and into the U.S. to conduct his fraudulent scheme and thereby made himself "subject to regulation and sanctions" here. Burger King, 471 U.S. at 473. This conclusion properly takes into account the activities of Homm's co-venturer and agent (Ficeto and HWM). See Stone v. Patchett, No. 08 Civ. 5171, 2009 U.S. Dist. LEXIS 35049 at *33-34 (S.D.N.Y. Apr. 23, 2009) (collecting cases that recognize that actions of one co-venturer are attributable to the other co-venturers in a personal jurisdiction analysis). Because of the extensive contacts of Homm and his co-venturer, exercising specific jurisdiction over Homm is reasonable.


Homm Was Properly Served

Homm also contests service of the SAC. He argues that the Hague Convention does not apply to him because his address is unknown (although he does not challenge the actual process used, effectively conceding that if the Hague Convention applies, then he was properly served). He claims that because Plaintiffs did not seek to serve him in any other way, he was never served

---

[15] Plaintiffs also argue that Homm waived personal jurisdiction by not asserting it in a motion within 21 days of being served by either the FAC or SAC. Pl. Oppo. to Homm at 14-15. As there is easily personal jurisdiction over Homm based on his contacts, this Court does not find it necessary to reach the waiver argument. While "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading," (Wright & Miller, Federal Practice & Procedure, § 1388, at 491 (4th ed. 2009)), failing to timely raise a defense does not automatically waive it. See, e.g., Ross v. United States, 574 F. Supp. 536, 539 (S.D.N.Y. 1983) (declining to apply waiver when personal jurisdiction defense was asserted late).

and this Court does not have jurisdiction over him. Plaintiffs counter that Homm's address is known and that no further service was required because Homm was already served with the FAC and failed to appear. Although his whereabouts were the subject of much debate during his years on the run, he was arrested by Italian authorities in the Uffizi Gallery on March 8, 2013, and is awaiting extradition to the U.S. to face a ten count criminal indictment returned by a grand jury in the Central District of California.

The Hague Convention and Fed. R. Civ. P. 4, which governs serving an individual in a foreign country, both stress "actual notice, rather than strict formalism." Burda Media, Inc. v. Viertel, 417 F.3d 292, 301 (2d Cir. 2005) (also noting that there is no prejudice to a defendant where a plaintiff attempted in good faith to comply with the Hague Convention and the defendant does not dispute having received the complaint in this action); see also Gurung v. Malhotra, 279 F.R.D. 215, 218 (S.D.N.Y. 2011) (stressing actual notice when there is some defect in formal service). The Hague Convention speaks only in terms of one's address, not one's whereabouts. Hague Convention, Art. I ("This Convention shall not apply where the address of the person to be served with the document is not known."). "Service is not intended to be a cat and mouse game." SEC v. Lines, No. 07 Civ. 11387, 2009 U.S. Dist. LEXIS 91811 at *12 (S.D.N.Y. Oct. 2, 2009).

It is quite clear that Plaintiffs knew Homm's address (29 Sussex Court, Spring Street, London, UK) and properly affected service on that address via the Hague Convention. Homm had all his financial and credit card statements sent to this address in 2006. ECF No. 35, Imes Service Decl. Ex. D. Homm's letter of resignation from ACM in 2007 listed the Spring Street address in its heading. Homm told Swiss prosecutors that the Spring Street address was his residence when they interviewed him in February, 2010. ECF No. 144, Imes Decl. Ex. H. at 5.

Homm does not dispute that he continues to own that property to this day.  Homm Decl. ¶ 9.

Homm's attempt to evade service by claiming that his whereabouts were unknown did not render

service under the Hague Convention ineffective.  Service of the SAC on Homm was complete on

August 16, 2012.  See Affidavit of Service on Florian Homm, ECF No. 129.

Additionally, Plaintiffs were not required to serve the SAC on Homm.  "No service is

required on a party who is in default for failing to appear," unless it is service of a pleading that

"asserts a new claim for relief."  Fed. R. Civ. P. 5(a)(2).  Plaintiffs effectuated service of the

FAC on Homm via the Hague Convention and via publication, and this Court issued an order on

June 25, 2010 deeming Homm to have been served on February 19, 2010.  See Order, ECF No.

82.  Plaintiff's SAC is functionally quite similar to its FAC, containing nearly the exact same

factual allegations of wrongdoing and causes of action against him.  Pursuant to Rule 5(a)(2), no

service is required when an amended complaint is substantially similar to the prior pleading.  See

Blair v. City of Worcester, 522 F.3d 105, 109 (1st Cir. 2008) (allowing a plaintiff to invoke Rule

5(a)(2) when the "original and amended complaints [were] substantively identical," and "the

factual predicate for the plaintiffs' claims did not change at all."); see also Gilles v. United States,

906 F.2d 1386, 1389 (10th Cir. 1990) (explaining that dismissal based on improper service of an

amended complaint is inappropriate so long as the amended complaint "relates back" to a prior,

properly served complaint); Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 20 (D.D.C.

2008) ("Where changes made in an amended complaint are not substantial, the requirement of

Rule 5(a)(2) . . . that a pleading that states a new claim for relief against a party in default must

be served on that party is not applicable," even when the causes of action in the amended

complaint are available under a new source of law) (internal quotations omitted).[16]

### The SAC Is Not Time-Barred

Securities fraud claims under Section 10(b) and Rule 10b-5 must be brought within two

years after discovery of the facts constituting the violation.  28 U.S.C. § 1658(b).  The statute of

limitations period only begins to run after "a reasonably diligent plaintiff would have discovered

the facts constituting the violation, including scienter—irrespective of whether the actual

plaintiff undertook a reasonably diligent investigation." Merck & Co. v. Reynolds, 130 S. Ct.

1784, 1798 (2010).  This displaced the prior "inquiry notice" standard that had been the law of

this Circuit. City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 173 (2d Cir.

2011).  The limitations period now commences when the reasonable investor, conducting a

timely investigation, would have uncovered facts constituting a violation, not when a reasonable

investor is put on notice that it ought to begin such investigation. Id. at 174.  As the statute of

limitations is an affirmative defense, dismissing claims on statute of limitations grounds at the

complaint stage is only appropriate if the "complaint clearly shows the claim is out of time."

Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999).

Plaintiffs filed this action on October 19, 2009, placing the start of the limitations period

two years earlier, on the same date in 2007.  Defendants submit that a reasonable investigation

would have been able to uncover facts sufficient to plead all elements of this scheme, prior to

October 19, 2007 for three reasons.  First, Plaintiffs here are the Funds themselves, not aggrieved

investors.  Defendants claim that because the Plaintiffs are the Funds themselves, they should

---

[16] This Court also notes that Homm's Motion to Quash Service and Motion to Dismiss were filed on November 14, 2012, nearly three months after service was affected on him and severely out of time.  This Court expects Homm to meet all future deadlines of this Court.

have known all along about the trading that was happening in their own books.  Second, Defendants contend that the Arness email, sent in April 2006 should have placed them on notice of potential fraud.  Finally, Defendants cite the ample press associated with Homm's departure in September 2007 as evidence that the Funds had a fraud problem that, had they timely investigated, would have revealed all elements of the scheme at issue.  Plaintiffs argue that a reasonable investigation would not have been able to reveal all the facts that would allow them to plead the elements of an Exchange Act violation (sufficient to survive a motion to dismiss) until well into 2008.

Plaintiffs have carried their burden to plead compliance with the statute of limitations.  It is unlikely that the Plaintiff Funds could have discovered the fraud that defendants were perpetrating in their own books prior to Homm's resignation in 2007 because, as the SAC alleges, Ewing ended the practice of providing detailed portfolio information.  SAC ¶ 186(a). Doing so concealed the positions that the Funds actually held and would have made it difficult for the Funds to detect fraudulent trades and inflated commissions.

The SAC also alleges that Ewing took steps to cover up the Arness email, and represented to the Funds merely that he had received an "anonymous letter" that he had investigated and was later retracted.  Id. ¶¶ 172-178.  The SAC provides a specific account of the meeting in which Ewing conveyed to two Fund directors that he had commissioned an investigation of the Arness email and that the investigation had not uncovered any misconduct. Id. ¶ 179.  It is somewhat disingenuous for the Defendants to now argue that the Funds should not have believed Ewing's representation and should have begun their own further investigation upon receiving his report.

Finally, disclosure of the existence of penny stocks in the Funds accounts upon Homm's resignation in September 2007 indicated that the Funds had an illiquidity problem, not necessarily a fraud problem. When this came to light, the Funds shareholders consented to a restructuring of the Funds, contingent on ACM conducting an internal investigation of the illiquid assets. Id. ¶ 238. This investigation was not complete until April 2008. Id. ¶ 239. It was only over the course of the months following Homm's departure and the apparent forensic accounting investigation that went through each of ACM's trades that the Funds were able to discover the illicit fund-to-fund trades disguised as "market" purchases, the fact that many fund trades were done with entities related to one of the Defendants such as HWM or CIC, or the improper use of The Hunter Fund. See id., ¶¶ 80, 95, 164-168. Given the magnitude and complexity of the fraud, a reasonably diligent plaintiff would not have had sufficient information to bring an action that would have been able to survive a motion to dismiss until well after Homm's resignation in 2007 (which preceded the start of the limitations period by only one month). Plaintiffs' action is timely.

### Morrison Does Not Bar the Application of U.S. Securities Laws

In Morrison, the Supreme Court limited the extraterritorial application of the Exchange Act, holding that § 10(b) and Rule 10b-5, only apply to 1) "transactions in securities listed on domestic exchanges" or 2) "domestic transactions in other securities." Morrison v. National Australia Bank, 130 S. Ct. 2869, 2884 (2010). The focus of the Exchange Act is on the location of the purchase or sale, "not upon the place where the deception originated," or the whereabouts of the investor. In re Satyam Computer Servs. Secs. Litig., No. 09 MD 2027, 2013 U.S. Dist. LEXIS 369 at *51, 55 (S.D.N.Y. Jan. 2, 2013) (quoting Morrison, 130 S. Ct. at 2884) (internal

citations omitted).  Plaintiffs argue that the transactions at issue here qualify as domestic transactions under both prongs of this test; defendants contend that they should qualify under neither.[17]

The transactions at issue here qualify as domestic under Morrison's second prong.  The Second Circuit recognized that the Supreme Court "did not have occasion to discuss what it means for a purchase or sale to be made in the United States." Absolute Activist II, 677 F.3d at 67 (quoting Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co., 753 F. Supp. 2d 166, 176 (S.D.N.Y. 2010) (internal citations omitted).  In interpreting this second prong, it held that "transactions involving securities that are not traded on a domestic exchange are domestic if [either, (1)] irrevocable liability is incurred or [(2)] title passes within the United States." Absolute Activist II, 677 F.3d at 67.  The SAC adequately pleads facts demonstrating that all three types of transactions at issue—the initial PIPE transactions, the subsequent manipulative trading of the penny stocks between the funds through HWM, and the fraudulent insider selling of shares from insiders to the Funds at inflated prices—are domestic transactions within the purview of the Exchange Act.

With regard to the PIPE offerings, the Funds both incurred irrevocable liability in the U.S. and title was transferred in the here.  Defendants do not seriously dispute this.  The offering memoranda associated with each PIPE purchase explicitly provided that the Funds incurred irrevocable liability upon delivery of the signed purchase agreement, and that this occurred in the

---

[17] The Second Circuit did not opine on whether domestic OTC markets are domestic exchanges in Absolute Activist II. It stated that this case "does not concern the first prong of Morrison—whether a transaction involves a security listed on a domestic exchange." Absolute Activist II, 677 F.3d at 66. At the same time, it also acknowledged Judge King's decision in SEC v. Ficeto, which involves many of the same allegations, in which he concluded that domestic OTC penny stock markets were "domestic exchanges," and thereby satisfied Morrison's first prong. 839 F. Supp. 2d 1101, 1107-17 (C.D. Cal. 2012). The Second Circuit concluded that it would take "no position on the issue." Absolute Activist II, 677 F.3d at 67, n.3. This Circuit has therefore not expressly adopted that position. Here, it is unnecessary to reach the issue of whether the Pink Sheets and the OTCBB are "domestic exchanges," because the conduct at issue here satisfies the second prong of Morrison as domestic transactions in other securities.

U.S. For example, the offering memorandum for the ProElite PIPE purchase specified that the Funds became unable to revoke their subscription at the point where they delivered the signed purchase agreement and a wire transfer or check for the full amount of the subscription to HWM (who apparently acted as the placement agent for this subscription). SAC ¶ 47. Legal title to the shares passed upon the closing of the transaction, which occurred at the Los Angeles offices of ProElite's attorneys, Troy & Gould P.C. Id. ¶ 50.

The subsequent trading of the penny stocks between the Funds through HWM were also domestic transactions. The SAC alleges that the scheme generally worked as follows: someone at ACM would simultaneously place a sell order from one Fund and a corresponding buy order from another Fund with HWM. See, e.g., id. ¶ 95. The first Fund effectively sold the security at issue to HWM, who then turned around and sold it to the other Fund. HWM entered into a contract to buy the security and simultaneously into a contract to sell it. "[I]rrevocable liability occurs when (and where) there is a binding contract for the purchase or sale of a security." In re Vivendi Universal, S.A., 284 F.R.D. 144, 152 (S.D.N.Y. 2012). If the Funds had wanted to simply move shares from one Fund to another, they would not have had to create a sale to HWM (in the U.S.) and a corresponding buy from HWM. This intermediate step was crucial to the scheme: buying and selling the penny stocks through HWM created at least the paper-thin appearance that the transactions were legitimate and allowed ACM to inflate the prices of the shares they traded. Defendants are not correct in their assertion that these transactions were simply between the offshore Funds—they were between the Funds and HWM, and HWM was located in the U.S.

Transfer of title also occurred within the U.S. on these inter-Fund transactions. In the securities context, courts look at the place where a trade settles to determine where title is

transferred.  See SEC v. Tourre, No. 10 Civ. 3229, 2012 U.S. Dist. LEXIS 165214 at *16-17

(S.D.N.Y. Nov. 19, 2012) (tracing the settlement path of a security to determine where title was

transferred).  Here, most of the penny stock trades were settled through the Depository Trust

Company ("DTC"), which is located in New York.  SAC ¶ 25(e), 70-71.  Shares that were not

eligible for settlement via DTC were settled by physical delivery to addresses in the U.S.  Id. ¶

72.[18]

## Plaintiffs' Breach of Fiduciary Duty Claim Is Not Subject to the Exclusive Jurisdiction of the Cayman Islands

Finally, Ewing argues that Plaintiffs' claim for breach of fiduciary duty should be

dismissed pursuant to Rule 12(b)(3) for improper venue.  He contends that this claim is governed

by his employment agreement, which has an exclusive forum selection clause of the Cayman

Islands.  The clause at issue states, "[t]his agreement shall be governed by and construed in

accordance with the laws of the Cayman Islands and the parties submit to the exclusive

jurisdiction of the courts of the Cayman Islands."  Ewing Decl., ECF No. 112, Ex. A, ¶ 29.1.

Plaintiffs argue that the clause only covers claims for breach of the contract itself, and that the

breach of fiduciary duty claim does not arise out of the contract, but exists independently.

Determining whether to dismiss a claim based on a forum selection clause involves a

four-step process.  The only step at issue here (whether the parties and claims at issue are subject

to the forum selection clause) is determinative.[19]  Phillips, 494 F.3d at 383.  "[W]hether or not a

---

[18] To the extent they were done with or through HWM or some other U.S. broker, the penny stock sales from HWM, CIC, or other insiders to the Funds also qualify as domestic transactions for the same reasons.
[19] The first step (whether the clause was "reasonably communicated to the party resisting enforcement") and the second step (whether the clause is mandatory or permissive) are not at issue.  Phillips v. Audio Active, Ltd., 494 F.3d 378, 383 (2d Cir. 2007).  There is no dispute that Ewing had notice of the clause and that "exclusive" is a mandatory term.  See John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors, Inc., 22 F.3d 51, 52-53 (2d Cir. 1994) (noting that the term "exclusive" is a mandatory term).  Because the forum selection clause

forum selection clause applies depends on what the specific clause at issue says." John Wyeth & Brother Ltd. v. Cigna Int'l Corp., 119 F.3d 1070, 1075 (2d Cir. 1997). Interpretation of a forum selection clause involves interpreting a contract; where the terms are clear and unambiguous, they are to be given their plain and ordinary meanings. See Horowitz v. Am. Int'l Group, Inc., 2012 U.S. App. LEXIS 17055 at *2-4 (2d Cir. Aug. 15, 2012). When the clause at issue is narrowly drawn, a collateral matter will generally be considered beyond its purview. ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 34 (2d Cir. 2002).

The clause here is narrowly drawn. It only states that Cayman law governs and construes the agreement itself. It does not state that Cayman law and Cayman courts must decide all disputes "relating to" or "arising under" the contract. When forum selection clauses contain "relating to" or "arising under" language, courts are inclined to interpret those clauses broadly to cover disputes beyond those for breach of contract. Coregis Ins. Co. v. American Health Found., 241 F.3d 123, 128 (2d Cir. 2001). By contrast, the clause here covers nothing beyond the agreement itself—it does not mention other causes of action at all. Plaintiffs have brought a tort claim, not one for breach of the agreement; therefore the forum selection clause does not cover the claim at issue.[20] See Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia, S.A., 572 F.3d 86, 91 (2d Cir. 2009) (noting that a narrow forum selection clause did not cover claims that did not sound in contract).

---

does not cover the claim at issue, the Court is not required to proceed to the fourth step (an analysis of whether the enforcement of the clause would be unreasonable). Phillips, 494 F.3d at 383-84.
[20] Plaintiff Funds are also not parties to the agreement, which is between Ewing and Absolute Capital Management Holdings, Ltd., Ewing's employer, although non-signatory status would not automatically prevent the Funds from being bound by the forum selection clause in the agreement. Aguas Lenders Recovery Group LLC v. Suez, S.A., 585 F.3d 696 701 (2d Cir. 2009).

## Conclusion

The Motions of defendants Ficeto, HWM, Colin Heatherington (together at ECF No. 119), Craig Heatherington (ECF No. 125), Homm (ECF No. 135), and Ewing (ECF No. 110) are DENIED in their entirety.  Defendant Angersbach's Motion to Dismiss for lack of personal jurisdiction (ECF No. 114) is GRANTED.


Dated: March 28, 2013
       New York, New York

                                        SO ORDERED:

                                        *George B. Daniels*
                                        _____
                                        GEORGE B. DANIELS
                                        United States District Judge
                                        MAR 28 2013

35